White, J.
The papers in the chancery suit referred to in the petition were introduced in evidence. The bill was filed by Jacob as complainant against David, Job, Mary the widow, and the present plaintiffs, Sarah Jane, and Mary Ann, then infants, the former in the twelfth, and the latter in the ninth year of her age.
The bill sets forth a description of the lands described in the petition in the present case, and states that in consideration that Jacob and Job had labored for their father several *years after they respectively arrived at age, he agreed to divide between them the three parcels of land described, consisting of two hundred and sixteen acres, and to convey tq each his proportion, “ independent of the interest each would he entitled to as heirs after his (the father’s) death, in the home farm.” The home farm is likewise described, and is said to contain about two hundred and fifty acres. It is averred that Job and Jacob were put in possession of their respective parcels hy their father in his lifetime, and that they-had continued in possession ever since.
The bill further represents that a similar agreement for a similar *456 consideration had been made by the father with David, the other brother, in relation to the tract of seventy-five acres; and that the father had died without making the conveyances he had agreed to make, either to the complainant, Jacob, or to the defendants, David or Job, and that they were left without a legal title to their respective farms.
It is stated that the widow is entitled to dower in the lands known as the home farm; and that these lands descended to the complainant, his two brothers, and his two infant sisters, heirs at law, each owning an undivided one-fifth.
The bill prayed that the defendants might be decreed to convey to the complainant title to his tract of land; that the widow’s dower in the home farm might be assigned, and the farm partitioned among the heirs.
On the 19th of September, 1844, the separate answers of David, Job, and the widow were filed. These answers admit the making of the agreement as set forth in the bill; and David and Job pray its execution on their respective behalf; and for partition of the home farm ; and the widow, disclaiming dower in the residue of the lands, asks to have her dower in the home farm assigned.
The journal of the court shows, no appointment of a guardian ad litem for the infant defendants ; but, on the 1st of October, 1844, the day of the filing of the decree, a formal answer of a guardian ad litem, purporting to be made in their behalf, was filed. This answer, the answers of the adult defendants, as well as the bill and decree, are in the hand-writing of the complainant’s solicitor.
*The decree filed in the case finds in accordance with the allegations in the bill, and grants the relief prayed for in the bill and answers.
It adjudges and decrees that Jacob, David, and Job shall each hold in fee simple the premises agreed to be conveyed to them, respectively (describing the premises), “free from any right or claim of the said Mary Mulford (widow), Mary Ann Mulford, and Sarah Mulford, in or to the said tracts, or any part thereof;” and provides “that the said Mary, Mary Ann, and Sarah be forever barred and precluded from claiming the same or any portion thereof, or any interest therein.” Dower is ordered to be assigned in the home farm, and partition to be made, subject to the dower, among the five heirs in equal proportions.
No conveyances are required to be made by the minors on their *457 «coming of age ; nor is there a day given them after that time within which to show cause against the decree, which, by its terms, takes immediate effect, and is in its nature absolute.
The only evidence on which the decree was taken was the deposition of Samuel Kyle, the father-in-law of the complainant, Jacob, taken at the office of the solicitor of the latter, on the 18th of September, 1844, the day on which all the answers of the adult •defendants were written. The deposition was taken under a notice •served only on the defendants who admitted the allegations in the bill, and the service of which they had formally acknowledged •several days before. No notice was served on any one representing the infants. David and Job, whose interests coincided with the plaintiff, but which were adverse to the interests of the infant defendants, were duly notified, as was the mother, who was voluntarily relinquishing her dower. There was no cross-examination. The whole of the testimony is as follows: “ That'prior to the decease of John Mulford, he [witness] had conversations with him in relation to the disposition of his real estate. Said Mulford told him he intended to give the seventy-five acre tract adjoining Middletown to his son David; and the Bruce and Freeman tracts to Job and Jacob- — Job getting the east part and Jacob the west part of the same. *The said John Mulford stated that Job and Jacob had been and were helping him to pay for the last-mentioned tracts by working with him after they were twenty-one years of •age; and that this was his reason for making such disposition of the same.”
There is nothing inconsistent in this testimony with the several tracts of land mentioned being regarded by the father as advancements to the sons. No contract is spoken of as having been made between him and them for the lands. The father declared “ he intended to give ” each of the sons a designated tract. Job and Jacob had been and were helping him to pay for two of the tracts by working with him after they became of age ; and “ this,” he said, “ was his reason ” for making the proposed disposition of his property. No promise could be implied against the father to pay them either in lands or otherwise for their continuing to live and work with him after they became of age. The consideration, or “ reason,” stated as moving him to make the contemplated disposition, was not .applied to David; yet, the terms used to express the father’s intention that David was to have the seventy-five acres, are as explicit *458 as those used to show that Jacob and Job were to get the other two tracts.
Nothing is said tending to sustain the allegation in the bill that they were, in addition, to get their full share as heirs in the home farm ; and the testimony indicated no more than an intention on the part of the father, in the voluntary disposition of his property, to advance the sons in the way stated.
The deposition 'does not state how long it was before John Mulford’s death the conversation referred to took place. He died in 1840, and at that time Job was in the twenty-third, and Jacob in the twenty-fifth year of his age, and David, who is not- mentioned as having assisted his father by his labor, was in his twenty-eighth year.
In the partition of the home farm, there was set off to David, 55 36-100 acres; to Jacob, 55 58-100 acres; to Job, 55 31-100 acres; to Sarah Jane, 42 36-100 acres; and to Mary Ann, 42 74-100 acres. The lots set off to Sarah and Mary were contiguous tracts, and together made 85 10-100 acres ; *out of which was assigned the whole of the widow’s dower, consisting of 77 42-100 acres: thus leaving to the minors only 7 68-100 acres not covered by the life estate of the widow, and to each one a parcel of less than four acres, of which the use and enjoyment could be had during the life of the widow.
The commissioners to make the partition, were not selected from the noigborhood, but from the town of Hamilton, eight miles distant from the lands.
At the February term, 1845, the assignment of dower, and the partition, as made by the commissioners, were confirmed, and one-sixth of the “ costs and -expenses of the cause,” was adjudged against each of the parties.
The journal entries are very meager — the following being all that the journal contains relating to the cause :
Jacob Mulford v. Mary Mulford et al.
] September term, 1843. j- In chancery. Bill filed. Returned j served.
Parties appear, and cause continued.
Jacob Mulford v. Mary Mulford et al.
] May term, 1844. 1- In chancery. Bill filed. On decree for J sale.
Parties appeared, and cause continued.
*459 Jacob Mulford v. Mary Mulford et al.
I September term, 1844. V In chancery. Bill for partition and ) answers filed.
Parties appear, and cause coming on for hearing, it is ordered, adjudged, and decreed, as per interlocutory decree on file, and cause continued.
Jacob Mulford v. Mary Mulford et al.
I February term, 1845. [ In chancery. Bill filed on decree for J partition.
Parties appear, and cause coming on for hearing, it is ordered, adjudged, and decreed, as per final decree on file.
No subpena, or other process, is found among the papers in the original case. Nor does the final record of the case contain, as the statute required, a copy of such process or of the return of the sheriff showing the manner of service. The following, which comes immediately after the copy of the bill, is all the record contains in respect to process, viz: “Therefore, the sheriff of the county of Butler, aforesaid, is ^commanded that he give notice to the said Mary Mulford, David Mulford, Job Mulford, Sarah Mulford, and Mary Ann Mulford, to be before the judges of our said court of common pleas immediately, at Hamilton, to answer the said bill, etc. And afterward, to wit: the--day of-, in the term of September aforesaid, before the judges aforesaid, here at Hamilton, comes the said Jacob Mulford, by his solicitor aforesaid, and the sheriff of the county aforesaid, to wit, William J, Elliott, Esq., now returns that by virtue of the writ afosesaid to him directed, he hath given notice to the said Mary Mulford, David Mnlford, Job Mulford, Sarah Mulford, and Mary Ann Mulford, to be, etc., on, etc., to answer, etc., as by said writ he was commanded.”
In the cost-bill there is no charge in favor of the sheriff for mileage or service of process, though there is a charge in favor of the clerk for issuing.
A great deal of testimony has heen taken in the case which can not be noticed in detail, but from which it satisfactorily appears that John Mulford, the father, before his death, comtemplated making a family arrangement for the disposition of his real estate, by which he intended to give to his three sons the several farms which they afterward respectively obtained, and to reserve for himself, his wife, and his infant daughters the home farm; that he gave David possession of his farm in 1838, and Jacob and Job possession of *460 theirs, respectively, in 1839; that he aided them to improve and cultivate their farms, by furnishing timber, teams, and in other ways, while he lived, but died before he had consummated his contemplated arrangement, and without having made conveyances; that the lands given to the sons were, in fact, advancements; and that there was no agreement that they were, in case of his death, to share equally with the other heirs in the “home farm.”
On the death of the father, the family living on the homestead consisted of the mother, Jacob, Job, Sarah Jane, aged eight years, and Mary Ann, aged five years — David at that time living on his •own land. No guardian was appointed for the girls. On the subject being talked about in the family, Job thought the appointment of a guardian unnecessary; *and, according to his testimony, “ David and Jacob managed the concerns of the girls first; ” afterward he assisted — rented their lands, accounted for the rents, and did other service, for which no charge was made. Mrs. Mulford states that Jacob and Job together acted as agents for the girls. From 1853 to 1857 she and the girls lived in Job’s family; and afterward, to the time of their marriage, the girls resided with their mother at the homestead. From the death of their father to their marriage, the property of the girls was managed principally by the brothers, among them, and on whom the former relied for advice and protection in regard to their rights and interests.
David’s education seems to have been superior to that of the other sons; and after he came of age he spent considerable time from home in traveling. He went to Europe, in 1836, with the aid of means furnished by his father; spent some time in the south teaching school; and in the spring succeeding his return home in the fall of 1837, he was given possession of his lands. Job in his testimony says: “ David was at home except when traveling ; can’t say what he did; he superintended some; suppose he more than paid his board.”
The deeds which were obtained from the girls as they respectively came of age, were all prepared by David for execution, without any previous authority from the girls; and were executed by them on the representations of their brothers that the making of the deeds was according to the order of the court; and in ignorance of their rights, and of the fact that any injustice had been done them in the division of their father’s estate. No consideration was paid, or expected to be paid for the deeds. No negotiations were *461 had, and no bargain or agreement was made, or contemplated, in. respect to the making of the deeds. The girls supposed they were merely performing a duty by perfecting, in legal form, undoubted pre-existing rights. And this they might well suppose from the influence it is reasonable to infer their brothers had over them, arising from the relation of dependency, trust, and confidence which had existed from the father’s death, and which still continued to exist between them as brothers and sisters.
*The justice before whom the first deeds were executed and acknowledged, testified that he “went to Jacob Mulford’s at request of David in 1851, to take acknowledgment of deeds; they were prepared; I did not read them; they said they related to the lands; deeds not explained. I asked David if I should read them; he said not that the pai'ties understood them. David professed to-be a kind of attorney and surveyor. Usually read the deeds to the parties; in this case I did not.”
The justice before whom the other deeds were acknowledged had died; and the testimony of the other witnesses was conflicting as to whether the deeds were read and explained to the girls at the time of their execution.
The girls were married — one in September, 1860, and the other in October, 1861; and it was not till after their marriage that they became definitely informed of their rights, and that the lands given to their brothers should have been taken into account in making partition of the home farm.
It appears in the testimony that when the home farm was being divided, “there was much talk in the neighborhood” about it; but the girls were then too young to know anything about their rights, and it does not appear that they were advised in the matter, after arriving at years of discretion, until after their marriage.
Mrs. Mulford, the widow, in her deposition, taken in 1864, states:
“ It has not been more than two or three years since the girls expressed their dissatisfaction and made a fuss.” “I assigned a note of one thousand dollars to them because they were dissatisfied. This was two or three years ago; after they were married.”
This note was given to her by David when the estate was settled, for her share of the chattel property of the estate. He renewed it once, before it was given to the girls, but has paid nothing on it.
*462 In regard to the partition of the home farm, and the institution of the suit for that purpose, Job, in his testimony, in speaking of himself and his brothers, states: “We talked together, and considered that the fences were running down, etc.; and if we had any interest it had better be attended to.”' *By the present action it is sought to impeach the decree rendered by the court of common pleas, at its September term, 1844; and to set aside the deeds obtained from Sarah Jane and Mary Ann on their respectively arriving at age. Our conclusions of fact fully appear in the foregoing statement of the case. The original suit was a bill in equity having a double object: first, the specific performance of the agreement alleged in the bill to have been made between the sons and the father in his lifetime, for the several tracts of land they respectively claimed; and, secondly, the partition of the residue of the real estate among the five heirs, in equal proportions. The extent of the interests of the heirs in the land to be divided was dependent upon the establishing of the alleged contract and the granting of the specific performance. If this relief was granted to the sons, the partition of the residue would be in equal shares; if refused, they would be charged with their respective tracts, in making partition, and their shares in the residue would be correspondingly diminished.
Though, in the form the suit was made to take, Jacob was the only plaintiff, and David and Job were defendants, yet their interests coincided; the suit was brought by a previous arrangement between them; and the claims of all were alike adverse to their infant sisters.
It is doubtful whether process was ever served on the infants; but, if service had been made, it would have made no difference in the degree, considering the tender years of the girls — one under nine, and the other under twelve years of age — and their dependence on their brothers for the management of their affairs. The whole management of the suit would have been left, as it in fact was, to the brothers. No guardian was appointed, and when the appointment of one was talked about, it was concluded none would be necessary. Strangers could not be expected to interpose; and while the brothers maintained their family influence over their younger sisters, and assumed to act for them and to manage their property, they were bound to act with scrupulous fidelity, and can *463 •derive no advantage arising either from intentional misconduct or :gross negligence.
The appointment of a guardian ad litem, is not a mere matter *of form. A suit against an infant can not be prosecuted without such guardian; and the object of the requirement is to secure to the infant a proper defense. “It is the duty of a guardian >ad litem to ascertain from the infant and his friends, or from other sources of information, what are the legal and equitable rights of his ward. And it is the special duty of the guardian to bring those rights directly under the consideration of the court for decision.” Dow v. Jewell, 1 Foster (N. H.), 486; Sconce et al. v. Whitney, 12 Ill. 150; Knickerbocker v. De Frust, 2 Paige, 304 1 Daniel’s Ch. Pr. tit. Infants. His authority is to protect; and the court will not suffer his ward to be prejudiced either by his admissions or his laches. Bingh. on Inf. 135. And “where the answer of the guardian admits the bill to be true, the complainant must prove its allegations with the same strictness as if the answer had interposed a direct and positive denial.” Enos v. Capps, 12 Ill. 257; 8 Ohio, 377; 4 Grill, 370.
It is plain there was no defense by a guardian ad litem. The ■only evidence of the appointment of a gurdian is a formal answer, the body of which, like all the other pleadings in the cause, is in the handwriting of the counsel of the brothers; and this answer was only filed at the time of the filing of the decree. It was evidently treated as a mere formal matter. No attention was paid to the interests of the infants, and the suit throughout was conducted -as though it were an amicable or ex parte proceeding, involving no ■subject of real controversy. The counsel of the brothers alone appeared in and had the management of the case, and his acts or omissions are chargeable as theirs.
The effect of the decree on the rights of the infants was to exclude the 291 57-100 acres advanced to the sons from being taken into account in the partition, and thus deprive them of an interest in the home farm equivalent to two-fifths of the land so advanced.
The decree was taken on a single deposition, which, on examination, is shown not to have warranted it. The deposition was taken ex parte as to the infants, but under a formal notice to the defendants, at whose instance, equally with the plaintiff, the suit was commenced. The form given to the %uit, and the manner of conducting it, was calculated rather to avoid than to invite ex- *464 animation and scrutiny from the court. On this point the language of the Lord Chancellor, in Richmond et ux v. Tayleur (1 P. Wms. 737), is pertinent. The suit was a bill in equity to impeach, a decree against an infant, on the ground of fraud and collusion. The chancellor said: “If any fraud or surprise upon the court had: been proved, I would have set aside the decree; but on the contrary, it appears that the court was fairly and fully apprised of the' case, of the articles, and of the point in question, viz: the lapse of time, and hath thought fit to make a decree, which, as it may be a just one, therefore I will not set it aside.”
And I am unable to see why a party who chooses to retain the influence and control arising from a fiduciary or a quasi-fiduciary relation to an infant, against whom he is’ prosecuting a suit to obtain a conveyance, should be held to a less degree of good faith in dealing with the court, in respect to the subject-matter, than he would be required to observe in dealing directly with the party:
Where parties dealing directly stand toward each other in such a relation, the obligation not only to abstain from false suggestions, but to make full disclosures, is imperative. And this principle applies to members of the same family dealing in that character as to their rights. Adams’ Eq. s. p. 179, note 1, and s. p. 183; Hill on Trustees, s. p. 148.
“ Imperfect information, given in a way calculated to produce a false impression, is equivalent to concealment. ‘He,’ says Lord Eldon, ‘ who, undertaking to give information, gives but half information, in the doctrine of this court, conceals.’ ” lb.
If the party intends to take the position and stand on the rights-of a stranger, or of an adversary, he ought first to surrender the advantages arising from the trust, confidence, and control which pertain to his fiduciary or quasi-fiduciary character.
The jurisdiction which courts of equity employ “to protect infants, is not confined to cases of a strictly fiduciary character. The principle on which relief is given, applies to all *cases where influence is acquired and abused and confidence reposed and betrayed. In the former, influence is presumed; in the latter, its existence must be proved.” Smith v. Kay, 7 House of Lord’s Cases, 751.
In delivering his opinion in the case last named — which was a bill in equity by a plaintiff to set aside a bond and securities given on his coming of age, confirmatory of debts contracted during. *465 minority — Lord Cranworth said: “In my opinion, although this1 bill is framed upon the ground of supposed fraud, the circumstances’ of the case, as now proved, make it abundantly clear that this fraud was totally immaterial in order to entitle the plaintiff to set aside this bond, upon the ordinary principle of the court which protects-an infant,' or any other person who is, from the relations which have subsisted between him and another person, under the influence, as it is called, of that other. There is, I take it, no branch of the' jurisdiction of the court of chancery which it is more ready to exercise than that which protects infants and persons in a state of dependence, as it were, upon others, from being imposed upon by those upon whom they are so dependent. The familiar cases of the influence of a parent over his child, of a guardian over his ward, of an attorney over his client, are but instances. The principle is not confined to those cases, as was well stated by Lord Eldon, in the case of Gibson v. Jeyes, 6 Ves. 266, 278, in which he says it is ‘the great rule applying to trustees, attorneys, or any one else.’ Now what does ‘any one else’ mean? It is contended that it applies only to persons who stand in what- is called a fiduciary relation. I believe, if the principle -is examined, it will be found most frequently applied in such cases, for the simple reason that the fiduciary relation gives a power of influence.”
This principle has application in the present -case, not only directly to the'manner of obtaining the deeds from the plaintiffs as they became of age, but applies also to the obtaining the decree, which was made the grounds for obtaining the deeds.
But independent of the question of fraud, there was clear error in the decree, not only in decreeing specific performance *of the alleged contract, but in making the decree absolute against the infants, without allowing them a day in court after coming of age, within which to show cause against it.
It is said by Chancellor Kent, in Mills v. Dennis, 3 Johns Ch. 368, that it was the ancient, and has been the settled principle of the court, that no decree should be made against an infant without giving him a day (which was usually six months) after he comes of age, to show cause against it; and he is to be served with process of subpena, for that purpose, on his coming of age.
In Sheffield v. Duchess of Buckingham, 1 West, 684, which was a case in which the infant was plaintiff, Lord Hardwick said he took it to be the course of the court not to give a day, unless a convey *466 anee was directed in form or substance. The correctness of this remark of Lord Hardwick has been doubted. See Harris v. Youman, 1 Huff. Ch. 178, where the authorities are' considered. But the present case comes within the rule as stated by Lord Hardwick. The decree had the effect, as against the infants, of a conveyance, by excluding them from their inheritance.
The authorities are abundant to show that the plaintiffs were entitled to their day to show cause against the decree, and to be duly notified before it could be made absolute against them. Dow v. Jewell, 1 Foster, 490; Harris v. Youman, supra; Wilkinson’s Adm’r, v. Oliver’s Rep., 4 Hen. & Mun. 450 ; Schofield v. Heafield, 7 Simons, 670 ; Price v. Carver, 3 Myl. & Cr. 157; Eyre v. Countess of Shaftsbury, 1 P. Wms. 120 ; Napier v. Lady Effingham, Id. 402; 2 Kent’s Com., side p. 245; Mackpherson on Infants, 212; Bingham on Infancy, 131; Seaton on Decrees, side p. 275.
Nor does the right to a day to show cause, depend upon the right of parol demurrer, that is, the right of having the pleadings stayed till the infant comes of age. The right of the parol demurring was abolished by statute in this state, and has been also in England. The chancellor, in Price v. Carver, 3 Myl. & Cr. 162, clearly points out the difference between the parol demurring and the giving a day to show cause. That was a case of strict foreclosure, and. it was held that the infant defendants had the right to a day to show *cause against the decree, on coming of age. The right, of course, does not exist in proceedings under special statutory provisions, nor in cases where sales are ordered to be made.
There is no doubt this decree would have been set aside on bill of review, if brought within the proper time. It is claimed on behalf of the defendants, that this was the plaintiffs’ only remedy. We think otherwise. That remedy would have been open to them if they had been adults; or if the decree had been perfected against them, by giving them a day in court to show cause against it, after they came of age; or if they had been strangers, under no disability or influence.
The obtaining from them the deeds was not calculated to awaken inquiry as to their rights, but rather to allay it. And tp deny them the right to inquire into the justice of the decree, when they have never had an opportunity to contest it or the claim on which it is founded, on the ground that the time allowed for filing a bill of review had passed before they discovered the wrong, would be uncon *467 seionable,' whatever may have been the actual intention of the parties in obtaining the decree.
Under the former practice, they would have had the right, on discovery of the wrong, to impeach the decree by original bill; and what would have been a good cause of action to sustain an original bill, is a good cause of action under the code.
In Richmond et ux. v. Tayleur, 1 P. Wms. 737, it was held that where an infant conceives himself aggrieved by a decree, he is not bound to proceed by way of rehearing or by bill of review, but may impeach the decree by original bill, in which it will be enough to say the decree was obtained by fraud and collusion, or that no day was given to show cause against it. And it is said in the note to the case, that Mr. Cottingham (the chancellor’s secretary) acquainted the court that Mr. Yernon, in case of an erroneous decree against an infant, used always to advise the bringing of an original bill to set it aside.
It is stated by Daniell, in his Chancery Pleading and Practice, that an infant may “ impeach a decree, on the ground of error, by original bill.” And that “ among the errors that *have been allowed for the purpose of impeaching a decree against an infant, is the circumstance that, in a suit for the administration of assets against an infant heir, a sale of the real estate has been decreed before a sufficient account has been taken of the personal estate.” Also : “ Another ground of error for which a decree against an infant may be impeached is, that it does not give the infant a day after his coming of age to show cause against it, in cases where he is entitled to such indulgence.” 1 Daniell’s Ch. Pl. & Prac. (Perkins’ ed., 1865) 153; Bennett v. Hamill, 2 Sch. & Lef. 566. The same doctrine is recognized in Adams’ Eq., s. p. 420; Mitf. Plead., s. p. 95 ; Story’s Eq. Plead., sec. 427.
The rule in equity within which to file a bill of review was twenty years. In this state the time was limited to five years. Whether to an original bill to impeach a. decree against an infant for errors such as have been indicated, the limitation prescribed for bills of review should be applied by analogy, it is not necessary to consider. For, if such should be the case, the rule would be qualified, in its application, by the equitable principle, that the time of limitation would not commence until discovery. The neglect of the plaintiff to secure the infant the right to show cause against the decree, *468 ought not to be allowed to work to his advantage, nor to the detriment of the defendant.
Lapse of time is pleaded as a bar. The limitation or lapse of time to be applied against the right of the plaintiffs to impeach the decree is that existing before the code, which excepts from its operation existing causes of action. In the absence of statutory provision, there is no principle of equity to bar the plaintiffs’ right. It is true, over eighteen years elapsed from the taking of the decree to the commencement of this suit; but the plaintiffs were very young at the time of taking the decree; and no laches can be imputed to-them until discovery, the delay in which is accounted for, in the present case, by the situation of the plaintiffs and their relation to-the defendants.
The deeds come under the limitation of the code. But if the decree is set aside, the deeds must be also. Without a valid decree the deeds are clearly fraudulent; and, in cases *of fraud, the time limited by the code does not begin to run until discovery; and the burden of showing such knowledge as will set the statute to running, rests on the defendants. This is not shown.
There is another ground upon which the right of the plaintiffs to relief, may, perhaps, be safely placed; and that is, by raising in the defendants an equitable or constructive trust in respect to the property in controversy.
Trusts of this description depend upon the conclusions of law independently of contract, and often arise in cases where there was no intention to create a trust on the part of any of the parties concerned; generally speaking, they are imposed in invitum. 1 Spence’s Eq. (side) 509. A court of equity will not permit any person standing ima fiduciary situation, or who, from the relation-in which he stands to another, is capable of exercising an undue-influence oyer his mind, to derive profit from any transaction which takes place during the continuance of such fiduciary character in the one case, or which may be supposed to have taken place by reason of such opportunities of undue influence in the other. Id. (side) 626.
Mr. Hill, in his work on Trustees, thus broadly states the principle upon which the court acts: “ Wherever the circumstances of a transaction are such that the person who takes the legal estate-in-property can not also enjoy the beneficial interest without necessarily violating some established principle of equity, the *469 •court will immediately raise a constructive trust, and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties, who in equity are entitled to the beneficial enjoyment.” Hill on Trustees (side), 144.
In the opinion of the court, the plaintiffs are entitled to a decree.
Day, C. J., and Welch, Brinkerhoee, and Scott, JJ., concurred.